UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
*********************************
                                *
ARTHUR PERNOKAS,                *
         Plaintiff              *
                                *
v.                              *     C. A. No. 04-10258-NG
                                *
BARRIE PASTER, M.D.,            *
         Defendant              *
                                *
*********************************
```



## PLAINTIFF'S MOTION FOR VOIR DIRE OF THE JURY VENIRE

Plaintiff moves the Court to permit limited attorney-conducted jury voir dire, or in the alternative, that the Court conduct individual voir dire. In support of this motion, plaintiff states that this is an action in which the plaintiff claims injury as a result of defendant doctor's medical negligence. Attached to this motion as Exhibit A is a "Proposed Attorney Conducted Voir Dire Procedure," and the procedure for Court conducted voir dire is set forth in the article attached as Exhibit B.

While it is often stated that the standard questions asked by the Court are adequate to unearth any prejudice, the common experience of the bar and bench is to the contrary. As Hon. Raymond J. Brassard points out in the article attached as Exhibit B, jurors are unwilling to identify their prejudices publicly. Only if they are queried privately, may the Court be confident that justice to all parties will be done.

"**Study: Four out of 10 Medical Malpractice Cases Are Groundless.**" This is a May 11, 2006 headline, touting a Harvard School of Public Health study (Exhibit C, Attachment 26 & 27), and is typical of the information to which potential jurors have been

subjected for several years. According to a study conducted by the Commonweal Institute, the myths related to medical malpractice are perpetuated by professional organizations such as the American Medical Association, the American Insurance Association, and the U. S. Chamber of Commerce. (Exhibit C, Attachment 25). Local organizations are equally invested in supporting this initiative (Exhibit C, Attachment 36 & 37), and the rhetoric has not been restrained: "Massachusetts . . . a 'D-minus' grade for medical liability environment." (Exhibit C, Attachment 38); "The Malpractice Lottery" (Exhibit C, Attachment 39)

This effort has been successful. As will be seen by an examination of the numerous newspaper articles, from statewide and local papers, television reports, and internet reports attached to this motion in Exhibit C, over the past five years, for the first time in American history, there was a Presidential campaign in which *both* political parties called for reform of medical malpractice laws because "too many lawsuits filed against our doctors have no merit" (President Bush, Exhibit C, Attachment 3), and we need "improvements that can substantially reduce meritless [medical practice] claims" (John Kerry, Exhibit C, Attachment 16). After his victory in the November election, President Bush announced that he intended to use his "political capital" for one of his priority items: to reform medical malpractice procedures (Exhibit C, Attachment 18).

This is not only a national issue. Governor Romney also has proposed a medical malpractice system in which the determination of claims would be taken out the Court system entirely (Exhibit C, Attachment 8), and during the campaign, he criticized Kerry's position on malpractice claims (Exhibit C, Attachment 12).

As recently as last week, Lt. Governor Kerry Healey has made medical malpractice

reform an integral part of her campaign to be elected governor (Exhibit C, Attachment 28, 29, 30 & 31), stating that

> [O]ur Liability system, as it applies to medical malpractice, is toxic. It's toxic to patients, to doctors and hospitals. It presents a real threat to patient safety, as well as to our edge in what has been dubbed "the white coat economy."

Lt. Governor Healey went on to state "I don't see any reason why our legal system should be profiting at the cost of driving up medical costs for the rest of society." (Exhibit C, Attachment 30 & 31)

It is noteworthy that the criticisms of the present malpractice system emphasize the costs to taxpayers, and the limitations on medical care which is available to all persons because of malpractice claims (Exhibit C, Attachment 21 & 22). Therefore, the public has been told, by politically successful leaders, that their lives will be affected adversely by individuals who bring medical malpractice claims.

One of the most noteworthy examples of this phenomenon occurred on May 25, 2006, when President Bush and Prime Minister Tony Blair met with reporters at the White House to discuss U.S. and British involvement in Iraq. Despite the obvious foreign policy purposes of this internationally televised press conference, the president found an occasion to interject the following statement:

> As far as health care goes, there are some practical ways to deal with health care costs, and one of the most practical ways is to **get rid of these junk lawsuits that are running good doctors out of practice and running up the price of medicine.** Passed it out of the House. **They can't get it out of the Senate because the lawyers won't let it out.**

(Exhibit C, Attachment 40. Emphasis added.)

The president was referring to the present effort in Congress to pass a national medical malpractice statute, which has been the occasion for further inflammatory

3

statements. (Exhibit C, Attachment 32, 33, 34 & 35)

The Court may assume, therefore, that jurors will have strong opinions and prejudices on this subject. However, there is no need for assumptions because of the polls conducted, in Massachusetts, by the University of Massachusetts McCormack Graduate School of Policy Studies, and nationally, by the Gallup Organization (Exhibit C, Attachments 1 & 1A). These polls make it clear that a significant majority of the public hold very strong, and negative, opinions towards medical malpractice claimants.

As Exhibit C, Attachment 2 demonstrates, the results of the polls were publicized in the press (for example, the Lawrence Eagle Tribune, which newspaper subsequently editorialized in favor of medical malpractice reform, see Exhibit C, Attachment 4), thus legitimizing, and reinforcing, these impressions.

In view of this information, the sole question for the Court to consider is whether the parties will be allowed to find out which potential jurors harbor these biases - and have the opportunity to challenge them. The only way in which this may be accomplished is through individual voir dire.

For the all of the stated reasons, the plaintiffs respectfully request that the Court allow attorney-conducted jury voir dire, or in the alternative, that the Court conduct individual voir dire.

By his Attorneys,

*[signatures]*

ROBERT C. GABLER, ESQUIRE
B.B.O. # 547227
CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
100 Summer Street, Suite 3232
Boston, MA 02110-2104
617-728-9123
June 5, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand, on June 5, 2006.

*[signature]*

CARMEN L. DURSO